I'm here, I know, you were saying something, and I didn't know what it was, I was whispering, yeah. Whispering doesn't work very well. Okay. Yes, ma'am. Thank you. Good afternoon. May it please the court. Wendy Obermeyer for Appellant Gregory Villegas, and I'll reserve two minutes for rebuttal. Today I'm addressing the sole issue on appeal following remand, which is the illegal forfeiture order. No other aspect of Mr. Villegas' sentence is at issue, including a $5.9 million joint and several restitution order. That was never challenged. Forfeiture, as opposed to restitution, disgorges ill-gotten gains, and so it's limited to tainted property and proceeds traceable to it. So what this court said in Thompson is we ask, where did the proceeds come to rest? And in this case, we know exactly where the proceeds came to rest, because the government traced them. Can I ask a question? Why did this remand take five years? That I'm not sure. There was pre- and post-hearing briefing, and then this court issued... Was it because they were waiting for Thompson or something? Possibly. I see. Thompson did come out after the remand hearing. All right. The parties were able to brief that. So we know here exactly where the proceeds came to rest, because the government traced all but $180,000 approximately. Well, in fact, we don't. I mean, that's what's so strange. I mean, one assumes that Mr. Villegas, aside from what he controlled, pocketed more than that amount of money that happened to be in his bank account. But the government hasn't proven any of it up to this point, maybe because they were trying to prove something else before Thompson. I mean, Thompson is the case that uses the come to rest phrase, whatever that means. Honeycutt doesn't use that phrase. And we know that in the Ninth Circuit, profits are not the point. It's proceeds. So that number, the number that happened to be in his bank account at the time they saw his bank account, it's close to meaningless under any of those terms, isn't it? Well, that represents the portion of the proceeds that was not in any other... No, it represents the portion that they happened to find in his bank account. So does everything else add up to the $5 million plus, or is there just no accounting for what happened to the rest of the money? It does add up to the total amount. So the two co-defendants together comes to about $2.3 million. And then there's nine unindicted co-conspirators that the government and the FBI agent outline in their motion in the affidavit that comes to about $2.75. Individually, as to money that they got that was split up? Yes, where this money went into the individual conspirators' bank accounts that had sole authority by each conspirator. Except that we know that, in fact, it wasn't their money going in. It wasn't their money coming out. They were straw people. Well, the government hasn't proven that it wasn't their money coming out. The government hasn't proven that money came out of those accounts and went to Vallejos. That's where the government's proof stops. So the government chose to trace the money to these individual conspirator bank accounts and alleges that Vallejos could have withdrawn money from these accounts. But there was testimony by Gagnon and this other person that said that he got the money. And the affidavit says he got the money. He told them what to do with the money, and they gave him the money. And then he gave them back some money. Well, to deal with the testimony first, that sentencing, that was pre-Honeycutt sentencing. It wasn't at the remand hearing. And it was addressing role for leadership for guideline purposes. It did not address forfeiture in bank accounts. But it addressed what happened to the money. So the money is all but accounted for, but $180,000, which is just about the amount he had in his account, which was $156,000, give or take. So when you add up those nine unindicted conspirators, which the government can reach through civil forfeiture, and the two co-defendants, we know exactly where the proceeds came to rest in this case and to hold the line. Judge Gould, if I can interject, please. The issue that's of concern to me is whether our panel would have the power, would have the ability to make a ruling about mastermind liability, which I think was not addressed in the Honeycutt or in Tom's. If I'm right in that, why could our panel not decide to reach that issue now and say that Mr. Villegas was a mastermind of this massive fraud scheme that was involved cheating hundreds of people out of their money and that we think that provides a basis to give joint civil liability for the full amount? I believe this court can't apply the mastermind theory here, both because the facts don't support it. We know where the proceeds came to end up individually. It's an end run around the rejection of Pinkerton that the Honeycutt court rejected. The circuits who have talked about a mastermind theory ultimately relied on legal authority over accounts, whether it was a married couple committing fraud like Singari, where the money came to rest in a joint account, or a house bought with proceeds by two co-defendants from that. And we don't have that here. And so this court not only would have to make a mastermind exception and explain how that does not violate Honeycutt, it would have to define what that is. And there were no findings here by the district court. It rejected the mastermind theory correctly. A mastermind theory might be broader than what the record would support or what we would need, but why don't we focus on who had control of the money at the time it left the hands of the victims? Apparently it was Villegas. In other words, he determined what money was going into these sham accounts and what money was coming out. I know you're disputing the second, but I thought there was a record that demonstrated that he also controlled when they came out. So that directly ties him to the money, not just to the plot, so to speak. And is that different? I don't look at that as a mastermind of the scheme. It's really that he was controlling the funds, even if at some interim point they were in individual accounts. So what Thompson explains and instructs courts to do is to not be so much concerned with where it passed through on the way to where it came to rest. And that's why Thompson held physical control isn't determinative of where proceeds ultimately come to rest. So here to stop in the middle and say, oh, that's where all the proceeds were obtained, is to ignore the government's tracing that takes the proceeds down to individual accounts. But we know they didn't come to rest in those accounts. They came out of those accounts in some fashion. They didn't stay there, and the people testified, the participants, that they got some relatively small portion of what was in their accounts. But there was no testimony as to what that was, and two of the defendants have been held liable for the whole entire amount in their accounts. Actually, that doesn't seem right to me at all, but they have been. And again, they testified that perhaps Villejas would ask for money out of these accounts, but unlike Thompson where there was 250 pages of bank records and transactional details, here we don't have that. So you're saying it's just a failure of proof is what you're saying. It is a failure of proof. But to say that the money actually came to rest in those accounts is not true. It's just they didn't prove anything else is what you're saying. That's where the government's proof ends, is that it traced it to these accounts and it didn't trace it any further. We don't have bank account records. We don't have transactional details. We don't have testimony of it was this amount that was withdrawn. It was this amount that I got paid. We don't even know those numbers. So we're left. If I may, Brooklyn wants to be heard also, even though I'm 3,000, 4,000 miles away. Good afternoon. Nice to be here again. So let me understand how you view Thompson. It seems that you're saying that this matter should be remanded in order to see whether this fits within the contours of Thompson, or you're saying something else. I'm saying this court is pretty much exact to Thompson. It involves a number of co-conspirators. It's the same type of fraud. We know where the proceeds ended up. And so we're asking this court to vacate the forfeiture order and remand with instructions to limit forfeiture to the 156,962 they proved came to rest with the Lehas. Well, I know that's what you're asking. Look, you know, I look at Salazar's papers here, and he has this qualifying language here with me. Like, for example, the 1 million plus, which he ascribes to one of the co-conspirators. He all says these were all controlled by the Legas. All these monies were controlled by the Legas. Is this something that really is an issue of fact that has to be ascertained? Or is that part of the government's proof? And how do we determine what that means in this particular case? Now, the government does, the FBI agent does claim he controlled that. But again, there was no testimony as to what exactly that meant from any of the co-conspirators at the remand hearing. And we don't have detailed bank records to say, oh, well, look at all of these deposits, look at all of these withdrawals, that we can take the tracing further. We're left with this tracing. Do you think the matter should be remanded to give the government that maybe second bite or that opportunity in light of the currency of all these cases? Well, I think that, you know, they appended for quite a while, and so the government had its chance to, you know, bring forth more evidence at the remand hearing and in the supplemental briefing, multiple supplemental briefings, that it only ever brought the FBI agent's affidavit to the court's attention. That was its only proof down below. And we're saying that's insufficient under Honeycutt and Thompson. It's sufficient to the point they proved where the proceeds came to rest, and now two defendants have been held to have obtained part of that. And so to hold Viejas liable for the entire amount is joint and several liability that violates Honeycutt. So as Judge Berzon said, I think, possibly correctly, that this is a question of the burden of proof and whether the government has sustained its burden of proof, is that basically your bottom line? Yes, our argument is that the government failed to prove that he obtained any more than the money for which he had legal control over in his bank accounts. To go back to Thompson for a minute, Thompson says, in many thefts, after obtaining the loot, the thieves divided it up. But that's not what these bank accounts represent. They don't represent the dividing up of the loot, right? They didn't come to rest in the sense that Thompson's talking about coming to rest. It was an intermediary step. Now, I don't know whether that matters, but you say that they came to rest there, but we know they didn't, in fact. Well, we don't know where the money went after that. That's true. We don't know where the money went, but it didn't come to rest. So that's where it came to rest for legal purposes, for title over that money, which is what forfeiture looks to. Forfeiture looks to who currently possesses, has title to, the ill-gotten gains. We know exactly where the ill-gotten gains are among all these co-conspirators, and it adds up. It adds up to the total proceeds. So to get more from Vallejos would be reaching into untainted, unproven assets. One conceptual question is, why can't more than one person acquire the money in a multi-stepped process, given that we know from Prasad that it's the proceeds, not the profits? So why can't one person collect all the proceeds and then another person be a distributee of some of those proceeds? Well, Honeycutt answers that question. It looked to the dictionary definition and common usage of the word obtain, and it says that supports the conclusion an individual can't obtain property that was acquired by someone else. I don't think Honeycutt actually says that. That's the paraphrase. Well, I have the exact quote. Neither the dictionary definition supports the conclusion that an individual obtains property that was acquired by someone else, but that doesn't talk to the sequential question. So I think looking at the steps, if there's no further proof of where it went after going through, say, these joint shell companies or things like that that occurred in these other circuit cases, they have found, okay, the money was all tied up in these joint companies where both individuals owned it, and so we're going to hold them both liable. Or married couples such as Singari and Sikosha were married couples that committed fraud. That's entirely different because they did have a joint in several countries. Yeah. So they had joint and several liability. Or Thompson explains where if your tenant's an entirety in property that was bought with proceeds. So forfeiture is narrowly limited to legal authority over tainted proceeds, and that's what we're asking this court to uphold here, that we don't meet any of those exceptions. Why does it have to be legal authority? I'm sorry? Why does it have to be legal authority? I think that's the best way. As opposed to, say, contractual authority. I mean, in this instance, we're told, I don't know whether it's true, that if there's money in somebody's bank account, they have legal authority over it. Between them and the bank, yes. But between them and the world, I don't know whether that's true or not. If I say to you, here's my money, put it in your account for a few weeks and then give it back to me, I don't know whether that's true that I don't have any property interest in that money. I don't know. And perhaps money could be hidden through a person, say, I'm going to pay you to put this money there. But we don't have that proof here. The government didn't reach that step. So we're stuck with the legal authority. Maybe it's an adequate proof, but that's what the affidavit says, and it's what was said at the sentencing hearing, that he told me to collect this money and put it in there and give it to him when I told him to. And he never said it was my money. But at least contractually it wasn't their money. I mean, there was some interest. They had some deal. They were going to put the money in when he said and take it out when they said it. You keep saying there's no proof of it, but is that because you think the affidavit is a hearsay? Is that why? Why is there no proof of it? Yeah, the affidavit is insufficient. Again, it's not backed up by bank account records, and there was insufficient proof of that. Perhaps the government could prove that if it brought some more evidence forward, but it's had two chances to bring that evidence. They had the chance to prove this, and they didn't. I mean, that seems to be your bottom line. It could be the right bottom line. Yes, they proved it up to a point, and that's where they decided to stop, and so that's what we're left with. And that begs the question, then, why hold the co-defendants responsible for what was in their bank accounts if they didn't actually obtain it? It does help open that question. But anyway, yes. So you're way over your time, and we'll give you a couple minutes to rebuttal. Thank you. Thank you. Good afternoon. May it please the Court, Adam Flake for the United States. I think the basic problem with the defendant's argument is that it ignores this Court's language in Prasad that says that a defendant can't avoid forfeiture by reinvesting his ill-gotten gains into the enterprise. We're dealing with co-conspirators here. That was not the case in Prasad. It doesn't seem to be factually apt at all. Prasad doesn't even talk about Thompson one bit. I'm sorry. I'm not sure if I understand the question. Judge Block from Brooklyn. I said that Prasad doesn't even mention Thompson, and we're dealing with co-conspirators in this case. That was not the case in Prasad. That's true. The people that Prasad paid the money to were not charged as co-conspirators in that case. But I think the point from Prasad holds, which is that what a defendant chooses to do with the money once he obtains it. But that's the question. Did he obtain it? I mean, your problem here is that you never actually – you have one affidavit and a couple of witnesses in the sentencing hearing who said, he told me where to put the money, and he took it out. But you don't prove anything about what happened when the money came out at all, right? Do we have any proof of that? That's correct, Your Honor. But the district court found that that was sufficient to show that – Villegas was calling the shot. He was the person in control. He owned – he obtained the money. He doled out the money, and the district court was very clear about that. Doled out the money when? At what point? After it came out of the bank account? He doled out the money throughout the course of the conspiracy. They would get payments in, and he would pay some of the co-defendants a percentage fee, and he would pay the overhead of the business, and he would presumably spend some – I mean, I'm not exactly sure. I don't think the defendants testified as to every expenditure that he made. They didn't testify to any of the expenditures they made, actually. Well, they did. I mean, they said that he paid them a percentage fee. Now, if you thought Thompson meant come to rest, maintenance, this idea of the conspirators dividing up the loot, we have no evidence about that. Is that right? Where the money – how much money he actually ended up with, and that doesn't mean profits necessarily, but how much money he ended up with. He might then have reinvested in the company, but we have no idea what he ended up with or what anybody else ended up with. We only know what was in bank accounts at various times. That's my understanding, Your Honor. But why isn't that just a failure of proof? Because I think the district court in this case found that the evidence presented was sufficient to show that he, by virtue of his position within the organization, his position being the top, and by virtue of him calling all of the shots, that was what the court looked to to find that he obtained the money. Everybody is – he's directing people, take this person's money and put it in this bank account. Take this person's money and put it in this bank account. Pay this person, pay that person. And once again in Persaud, there's a line in that case that says, the ability to dispose of the money denotes control of the money. If you are – See, if I may, it seems to me that you have Thompson, that you have to come to peace with one way or the other. And as I read Thompson, if you have co-conspirators and they divide the money up amongst themselves, it comes to rest with each of them and their particular amount of money, that may or may not have been the case here. I don't know. But when you talk about the fact that there's an X factor here, he's a distributor, but we have no idea whether the money he distributed was coming back to him. We don't trace the funds at all. We have no idea whether he controlled those funds. All I see here is that we have co-conspirators and the money was divided up by the head guy. I don't see how that differs from Thompson, but I'm willing to be educated. Well, I would distinguish Thompson in that there was no allegation there that one of the co-conspirators was controlling the other member of the conspiracy. Where did he control here? I mean, what happened to the money after it went to the co-conspirators? Is there some evidence here that he controlled, that he told them what to do with the money, that they put the money into assets or into a fund that was controlled by Blagos, that they returned the money, that they did something in kind, they bought automobiles for him, whatever? I get that, but all I have is a naked allegation here by Salazar that all these things were controlled by the Blagos, and I don't see it. There's language in the plea agreement to that effect. There's testimony at their sentencing to that effect. What is in the plea agreement? Let me just pull it up so I don't try to go from memory. I mean, let's see what the plea agreement says. Sorry. This is at ER 703. Villegas directed others to act as nominees. Villegas paid the nominees a percentage fee. Villegas knowingly acquired victim leads, engaged in sales. I mean, it certainly doesn't have dollar amounts, but the plea agreement alone I think amply supports a finding that he was the person that was in control of how the money in the conspiracy was taken in and how it was disposed of. Look, if we have evidence as to what happened by the co-conspirators, for example, did they buy cars for him? Did they put any money back to him in one form or another? Did they buy gifts for him? I get that. I can really go there, and I can understand that, but we seem to have a total absence of what it means to be controlled by Villegas here other than these general conclusions that you trot out. That's my problem with the case. Your Honor, I think it just simply means, I mean, I don't know how to explain it other than to say he was the boss. He was calling the shots. So are you arguing for a mastermind version of Honeycutt, that's basically? Well, you are. That's what you're saying. Does it matter whether he was connected to the money or whether he was just running the whole thing? I mean, I don't think the court necessarily needs to find that there's a mastermind, except it certainly can. We argue that in our brief. Well, I don't understand. The district court said he wasn't finding a mastermind exception, and then it seemed to me he did find a mastermind exception. What's the difference between what he found and whatever a mastermind exception might mean, which I don't think is in Honeycutt anyway, but yes. Well, the terms that the district court put it in were, by virtue of his rank in the enterprise, he obtained these funds, and therefore I don't need to address whether or not he was also, whether purely the fact that he was a mastermind means, because by nature of his position, he obtained the money that flowed into the enterprise. That was the distinction. Why wouldn't that be true of anybody who, quote, was a mastermind? I think it would be. I think the district court certainly could have found that, but that was the distinction it drew. It said I don't need to find whether or not there is this exception because by virtue of his position, he had the ability to dispose of all of the funds. Do you think the forfeiture orders against the co-conspirators were proper in light of Thompson? They were before Thompson, right? And it doesn't seem to me that they actually comport with Thompson because the money did not, quote, come to rest with them. We know that. I'm not sure. I mean, I don't think that their orders are in front of the court. But they are in the following way. If their orders are impregnable now, and they probably are whether they were right or wrong, then if we were to find, as you're asking us to, we would have overlapping forfeiture orders, right, which does seem in some tension, great tension with Honeycutt. I mean, they would have to be joint and several. What else could they be? That's correct, Your Honor. But I think the difference, I think the oddity that comes in this case is the distinction between having actual control and having, like, signatory control. And the defendant puts a lot of weight on that. Let me ask you this question, if I may. This may be the $64 question, whatever you call it these days. Do you want to stay on this record that you have, or would you like the opportunity to go back and see what he can trace where all these monies came from and what was done with all those monies? I want to know what your position is. I don't think that there is any reason for this court to find that the district court committed clear error in finding that Villegas occupied such a role in the position. I don't think that we need additional evidence on that point, but if the court wants us to seek it, we certainly will comply with what the court does. But suppose we thought what mattered was where the money, quote, came to rest, i.e., in terms of Thompson. How did the Colton's Burgers divide up the money? We don't know anything about that. Other than the accounts, I mean, no. I mean, we don't know. Today we don't know where the money is. Well, we don't know what happened to it. We know these were phony accounts, right? So we know that they didn't come to rest there. That's what bothers me. They didn't come to rest there. The money did not come to rest there. It came out of those accounts at Villegas Directional, according to your affidavit, your submitted affidavit. And we don't know what happened after that. So what Judge Block's question is, do you therefore lose if we think that's what matters, or do you get to try again? Well, I would rather try again than lose, obviously, Your Honor. But I think that the evidence – I think what matters is who obtained the funds. And I think that the evidence amply supports the district court's conclusion. So your position is that they both obtained – because we know that all of the money that it's accounted for was in a bank account in someone else's name at some point. And according to the forfeiture order that you do have, your position is that that money was obtained by the straw owners of these bank accounts. Yes. And so therefore you have a complete overlap between your concept of the money either coming to rest or being obtained by those conspirators because of the bank accounts and Villegas controlling the money that went into and out of those bank accounts. So you have a double forfeiture. You have a joint and several forfeiture. And the question is, how can that be reconciled with Honeycutt? I think that it can be reconciled in that more than one person can obtain something. I don't think that Honeycutt says that only one person can obtain something. Sequentially or coincidentally? I would think certainly sequentially. But also with the example of joint tenants and things like that, we had one person that was a signatory to a bank account. We had another person who was making the decisions. One person has legal authority to exercise, to dispose of that.  Even though it was very clearly belongs to, like your Honor said. Is that really true? I'm just curious. If I say to somebody, you know, I don't have a bank account right now. I'm going to give you a check for $5,000. Do me a favor. Put it in your bank account just so it's in some bank. And then in two weeks I'm going to open up a bank and you can give it to me then. So have I now lost any property interest in that money? If that person decides to just take it and run away? I'm not sure about that, Your Honor. I'm not either. And you keep saying that they could have done that. But, I mean, if I have a bank account with money sitting in it and I'm the only person whose name is on the bank account, I don't see anything that forecloses me from spending that money. Between you and the bank, yes. But between you and the world, I don't know why that's the case. I'm not speaking legally. All right. Probably I couldn't legally do that if it was money that was— But your position seems to be that they don't legally have that money, and I'm not at all sure that's true. But I think, in fact, like these people are not obeying the law. In fact, they had control. Villegas had control over it, and he exercised it. It's just cool if I could interject a related question. Is there anything in Honeycutt from the Supreme Court that would stop our panel from holding that a person like Villegas, who can control the disposition of the funds, can be liable for the entire amount? I don't see anything in Honeycutt that forecloses that. I think Honeycutt left it open. And as we cited in our brief, many other courts have subsequently held that, purely based on the mastermind exception that we were speaking about, that purely by virtue of that, without respect to the, you know, who owned what bank account. Now, the second question is, is there anything in Honeycutt that would foreclose us from holding that if all of it has already been attributed to other people? Well, let's say, just forget about the undecided co-conspirators. Two and a half million dollars of it, or something like that, has already been determined to have become terrestrial, been illegal property, or at least subject to forfeiture by other people. So we now have this overlap. Does Honeycutt allow that? Well, I think that... Which is a separate question from the other one. I mean, if we didn't have the other forfeitures, it would be a different problem. Yeah, I don't think... I mean, the situation in Honeycutt was, with the example of the drug dealer and the college student that he's paying, I don't think that Honeycutt speaks to whether or not the drug dealer, the top dog, would be on the hook for the whole thing. But we know that in Honeycutt itself, and in the hypothetical, that the other person, the manager of the hardware store and the college student, were collecting the money. Right. So they had the money in their hands at some point. Right. So yet Honeycutt seemed to hold that they were not subject to the forfeiture because the money ran through their hands. And therefore, you didn't have this problem of having joint and several. But if the people whose money runs through their hands and they're subject to forfeiture, which is what the order is here, then you do have a joint and several problem. I think I'm following what Your Honor is saying. I mean, it certainly is joint and several in the sense that they both are on the hook for it and we can only collect it once. Honeycutt seemed to assume that people in the position of these co-conspirators who collected the money and dispersed it but never really controlled it were not subject to forfeiture. That seemed to be the assumption, not the holding, actually, in Honeycutt, that the college student, assuming he collected all the money, and the store manager, assuming that he at least took it in, and maybe he put it into the hardware store's account, but I don't know if it would have been any different if he put it in his own account and then in the hardware store account. So their assumption seemed to be that these people were not subject to forfeiture. But we have an order here that these people are subject to forfeiture, so it's a very strange situation. It is strange. Again, though, I don't think it helps Mr. Villegas because I think that he, as the one who was in charge of everything and basically orchestrating the money moving around... Well, I don't think it helps him if you think that point two of Honeycutt is that you can't have two people responsible for the same money for forfeiture purposes. That's true, Your Honor, but again, I think that the problem arises with reinvesting in the enterprise because if Mr. Villegas is paying nominal fees to keep the enterprise going, that money is... He controlled it. He paid it. He did it to keep the enterprise going, and that gets into the problem of profits versus proceeds. But as Judge Block said, the theory in Prasad was... The structure of it was the employees who were being paid were not conspirators. I mean, they were employees. It was like buying widgets or something, buying pencils. But here, these people were conspirators or were determined to be conspirators, so it's more like the Thompson theory of dividing up the spoils by the co-conspirators. Except we don't know what they divided up. All right, your time is out. If you have anything you really want to say, you should say it. I'll submit. Thank you. Thank you. I'll give you two minutes in rebuttal. Thank you, Your Honor. First, as to whether the government should have another chance to prove its case under Thompson, this case sat for a couple of years after Thompson was issued, and the government didn't request a new hearing, and it didn't offer any new evidence. And so it has waived its chance to prove the case under further. And the exception that the government's asking this court to apply goes against not just Honeycutt, but the central idea that forfeiture doesn't examine someone's role or who caused the harm. You know, that's more for restitution purposes. Forfeiture is to find where the money ended up, and the government here chose to trace to these individual bank accounts and stopped. So for the government to get around Honeycutt by the alleged control, it's unclear how that's different than Pinkerton liability. It's a question of control over what, right? I mean, I think what the district judge was trying to do was to differentiate between the person who ran the scheme and the person who ran the money, which isn't necessarily the same person. And for forfeiture purposes, I think it's important who ran and controlled the money is looking to who ended up with those ill-gotten gains, because it's limited to reaching tainted property and the proceeds traceable. But that's what we want to know. We have no idea here. So then you have to rely on just a failure. Yes, we have to rely on the record we have, which is that the two co-defendants ended up with $2.3 million. They didn't end up with it. They, in fact, did not end up with it. So we have to just forget about them because they didn't end up with it. We know that. But on the other hand, we don't know what Villegas did end up with. We're left with the order that they forfeit $2.3 million of this amount. And so it's our position that Villegas cannot be ordered to forfeit that same amount because that amounts to joint and several liability, and it relies on Pinkerton, and both of those are forbidden by Honeycutt. Why can't you have people sequentially acquiring money? I think you can have more than one person, you know, as the money changes hands down the conspiracy. Right, so why is there joint and several liability if as the money changes hands you hold one person responsible for it and then you hold another person responsible? It's joint and several in the sense that the government can't collect twice, but it's for different things, for doing different things. But that's what joint and several liability is, multiple people responsible for harm all held for the same amount. You can't have it. It can't be sequential. It can't be that if I obtain the money and am responsible to forfeit it that you also obtain it and are responsible to forfeit the same money. That can't be. I think it can change hands, but where it ultimately comes to rest is the question that needs to be asked. And we're left with the evidence here the government provided, which is that it came to rest in these individual accounts. All right. Thank you very much. Thank you both very much for a case that turned out to be more complicated than it appears. Thank you. All right, we are adjourned. All rise. This court for this session stands adjourned.
judges: GOULD, BERZON, Block